

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

             Plaintiff,

    v.

APPRENTIACE SINGLETARY,

            Defendant.

**REPORT AND**
**RECOMMENDATION**
14-CR-6032

## Preliminary Statement

By text Order of Judge Frank P. Geraci, Jr., dated March 21, 2014, all pre-trial motions have been referred to this Court pursuant to 28 U.S.C. § 636(b)(1)(A)-(B). (Docket # 9). The two-Count Indictment in this case charges defendant with drug conspiracy and the possession and discharge of firearms in furtherance of drug trafficking crime. See Superseding Indictment (Docket # 24). Currently pending before the Court is defendant's motion to suppress statements. (Docket # 14). The Government has filed papers in opposition to this motion. (Docket # 16). On August 26, 2014, a suppression hearing was held. On November 24 and December 8, 2014, the defendant and the Government submitted their respective post-hearing briefs. (Docket ## 35, 37). The following is my Report and Recommendation as to the defendant's motion.

## Relevant Facts

While the chronology of events on March 3, 2014 were largely undisputed, there are material differences in the critical area of whether defendant Singletary was read his Miranda rights prior to being interviewed that day.  These differences required the Court to make credibility determinations, taking into account the events described, the manner in which the witnesses described the events, and the plausibility of the version of events adopted by the witness.

The testimony adduced at the suppression hearing on August 26, 2014, revealed that in January 2014, Rochester Police Department ("RPD") Investigator Matthew Klein was investigating a shooting that took place that month on Roth Street in Rochester, New York. See Transcript of August 26, 2014 proceedings (hereinafter "8/26/14 Tr." or "Tr.") (Docket # 31) at pp. 3-4.  Investigator Klein testified that defendant Singletary had become one of the suspects during the investigation and, as a result, Klein made efforts to locate him for an interview. Tr. at pp. 4-5.  Specifically, Klein obtained "numerous locations" of addresses where defendant had lived, and Klein "spoke to [Singletary's] relatives and left business cards with my phone number" for Singletary to contact him. Tr. at p. 5.  Klein testified that at some point between January 2014 and March 2014, he received a telephone call from Singletary, and Klein explained "to him that we needed to talk about an

2

investigation." Tr. at p. 5. Klein testified that Singletary "wanted to do it over the phone," but Klein explained "to him it needed to be done in person." Tr. at p. 5. Defendant Singletary testified during the hearing that Klein never told him why he wanted to speak with him, and instead told him "he wasn't at liberty to discuss it over the phone" so "he wanted to meet with me in person." Tr. at pp. 37-38. Singletary told Klein "if he couldn't talk to me on the phone, then I didn't want to talk to him." Tr. at p. 38.

On March 3, 2014, Klein was off duty and received a telephone call from Officer Mike Magry and Sergeant Rob Wetzel. Tr. at p. 6. The officers told Klein that Singletary had been "taken into custody," and they asked Klein "where I would like to have him brought." Tr. at p. 6. Klein testified that Office Magry "was part of a Marshal's task force that was looking for Mr. Singletary." Tr. at p. 23. Klein told the officers to bring Singletary to the "East division office." Tr. at p. 6. Singletary was transported to the East Division Office at "a little bit after 2, 2:30 [p.m.]" that day, and Klein arrived later that day at approximately 4:00 p.m. Tr. at p. 6. Singletary was held in an interview room for approximately two hours before Klein arrived to interview him, and was afforded the opportunity to use the rest room while he waited for the interview to commence. Tr. at p. 15.

Prior to meeting with Singletary, Klein met with Investigator

3

Ed Bernabei at the East Division Office and reviewed materials regarding the January 8th shooting on Roth Street.  Tr. at p. 31. Klein testified that the "purpose" of his interview with the defendant that day was to speak with him about the shooting that occurred on Roth Street on January 8, 2014, and one of his "goals" with respect to interviewing the defendant was to "tie up some loose ends with respect to that case and get him to admit he was involved in that shooting," because ordinarily that is "the goal of any investigation."  Tr. at pp. 26, 32.

Klein and Investigator Bernabei entered the interview room together to commence the interview with the defendant.  Tr. at pp. 7-8.  Klein testified that the interview room was a "standard size interview room," which was "maybe 10 feet by 10 feet with a metal table in the center of the room and three circular stools that are welded to the frame of the table."  Tr. at pp. 8, 25.  Klein testified that when he entered the room, he introduced himself to Singletary and began to engage in "preliminary conversation" with him.  Tr. at p. 9.  Klein had discretion with respect to whether to record the conversation with Singletary, but made the decision not to record the interview.  Tr. at pp. 30-31.  Klein was carrying his service weapon when he met the defendant, but he "had a jacket on that did cover up my service revolver," and Investigator Bernabei did not have his service weapon "on his person at the time."  Tr. at pp. 25-26.  Klein testified that Singletary "was upset" during

4

the interview.  Tr. at p. 9.  Klein testified that Singletary told him "that he talked to me on the phone and he told me he wasn't at his grandmother's house, yet I still had the police officers going to his grandmother's house."  Tr. at p. 9.  Singletary testified that prior to being brought down to the police station that day, he attempted to call Klein "probably two or three times, because he went to my grandmother's house and my grandmother gave me his card and she said, 'call him.'"  Tr. at p. 38.  Singletary "got angry because he keep coming to my grandma's house, he going to all my family member house.  But ... he don't want to tell me why he want to talk to me.  But [Klein continued] harassing all my family and harassing all these people looking for me."  Tr. at p. 39.

At that point, Klein attempted to obtain "pedigree information" from Singletary "[t]o determine that I'm talking to the right individual" and to determine if he was "sober, conscious, [able to] read, write, understand English, taking any prescription medications."  Tr. at pp. 9, 11.  Klein asked defendant his education level and whether "he could read, write, understand English," and also asked him "if he is taking any prescription medications" or whether he had "used any alcohol, marijuana or illegal drugs" in the past 24 hours.  Tr. at p. 11.  Klein testified that Singletary told him "he could read, write and understand English," had not completed high school, was "not taking any prescription medication," but "he smoked about a dime bag of

5

weed about 10:30 on that day." Tr. at pp. 11-12. Klein then asked defendant "if he was still feeling the effects of the marijuana." Tr. at p. 12. Specifically, Klein asked defendant whether "he was sober," and Singletary told Klein "he was." Tr. at p. 12. Klein testified that he had received training "regarding the effects of alcohol and also narcotics use," and during the course of his training and experience as an RPD Officer and Investigator he has come into contact with individuals under the influence of marijuana "[h]undreds of times," and Singletary did not exhibit any of the signs of someone under the influence of drugs or alcohol when he interviewed him that day. Tr. at pp. 12-13. Klein recorded all of Singletary's responses to the pedigree questions "verbatim" on an RPD Notification and Waiver Form 1185 card. Tr. at pp. 9-10, 13. Singletary confirmed during the suppression hearing that the questions and answers on the Waiver Form 1185 card regarding his pedigree information "are answers that came from me." Tr. at p. 42.

Klein testified that after obtaining the pedigree information, at 4:57 p.m., he advised Singletary of his Miranda warnings. Tr. at pp. 13-14, 23. Klein testified that no other law enforcement officers had "read him his Miranda warnings prior to me going in the room." Tr. at p. 25. Klein read the Miranda rights "verbatim" off of the RPD Notification and Waiver Form 1185 card. Tr. at p. 14. Klein testified that for each line "No. 1 through 5" of the

6

<u>Miranda</u> warnings he asked Singletary "if he understood," and Singletary "specifically said 'yes'" after being read each specific warning.  Tr. at p. 14.  After reading Singletary all five <u>Miranda</u> warnings, Klein then asked the defendant two waiver questions.  Tr. at pp. 14-15.  Klein noted Singletary's responses to the waiver questions on the Waiver Form card.  Tr. at p. 15.  Specifically, when asked whether he understood his rights, the defendant answered "yes, I understand," and when asked "with these rights in mind, do you agree to talk with me now," the defendant answered "yeah."  Tr. at p. 15.  Klein testified that neither he nor Investigator Bernabei threatened defendant or in any way tried to induce him to give up his rights and speak to them.  Tr. at p. 15.

During the August 26th suppression hearing, Singletary contradicted Klein and testified that he was never read his <u>Miranda</u> rights by either Klein or Bernabei.  Tr. at p. 37.  Singletary testified that the investigators told him "that somebody said I was involved in the shooting," so "they wanted to speak to me and know my side of the story."  Tr. at p. 37.  Singletary maintains that Klein tried "to pressure me into saying" that he was at the scene of the shooting on Roth Street.  Tr. at p. 43.  Singletary testified that he "was on Roth Street, the date of the incident when the situation happened," but "never had a gun" and does not "know anything about a shooting."  Tr. at pp. 43-44.

Klein testified that after Singletary stated that he

7

understood his rights and agreed to speak to him, Klein commenced the interview.  Klein testified that Singletary was "argumentative" throughout the interview.  Tr. at p. 16.  After approximately one hour, Klein "wanted to take a break" because the conversation with defendant "was argumentative" and he thought it would be a good idea to "take a break, go out, draft up [a summary of their conversation so far] and then enter the room a little while later."  Tr. at pp. 16-17.  Klein testified that at no point during the first hour of conversation did Singletary ask for the questioning to stop or ask for an attorney.  Tr. at p. 16.  Klein testified that neither he nor Bernabei threatened Singletary during the conversation, and no other officers came in or out of the room.  Tr. at pp. 16-17.

During the break, Klein typed up a "basic summary of our conversation based on his words."  Tr. at p. 17.  When Klein reentered the room with Singletary, the defendant was alone and Klein presented him with the statement he had just typed up.  Tr. at p. 17.  Klein went through the statement with the defendant, and the defendant "did not like the statement that [Klein] had pre-typed."  Tr. at p. 18.  Klein asked the defendant "what he did want or what he would like to have on the statement and what would be accurate," and based on what the defendant told him, Klein "then wrote what he told me or what he wanted me to say below the typed portion."  Tr. at pp. 18-19.  Klein had Singletary "initial and

8

circle the portion that he agreed to."   Tr. at p. 19.   Klein
testified that neither he nor Bernabei threatened Singletary in any
way to induce him to initial the bottom of the statement.   Tr. at
p. 19.   Singletary testified that he "voluntarily" put his initials
on that page, and confirmed that "[n]obody forced me to do that."
Tr. at pp. 44-45.   Singletary testified that the written portion
next to his initials "was accurate to what I said."   Tr. at p. 47.
Klein  testified  that  he  also  asked  Singletary  to  sign  "the
signature portion" of the statement, but Singletary "refused to
sign it."   Tr. at p. 19.

       At that point, Klein ended the interview because "we really
had  nothing  else  to  talk  about.    The  conversation  had  run  its
course."   Tr. at pp. 19-20.   Klein testified that the defendant
asked him at the end of the interview "or at some point during the
interview" whether he was under arrest with respect to the Roth
Street shooting, and Klein told him "yeah."   Tr. at pp. 26-27.
After the interview, Klein drafted a summary of the statement he
obtained  from  the  defendant  and  included  it  in  a  three-page
investigative action report.   Tr. at p. 20.

       During the suppression hearing, defendant Singletary confirmed
that  he  has  been  arrested  several  times  before,  has  multiple
convictions for both felonies and misdemeanors, and had "been in
contact  with  the  criminal  justice  system"  on  multiple  occasions
prior to March 2014.   Tr. at pp. 48-51.   However, Singletary

testified that he had never previously been interviewed by the police, and had never been read his <u>Miranda</u> rights.  Tr. at p. 51.

## Discussion

With the instant motion, Singletary moves to suppress the statements he made to law enforcement on grounds that he was not read his <u>Miranda</u> warnings prior to being questioned by the police during a custodial interrogation in violation of his Fifth Amendment rights.  Specifically, Singletary asserts that while in custody on March 3, 2014, he was interviewed at length by the Rochester Police Department without the benefit of receiving <u>Miranda</u> warnings.  Singletary argues that he never received nor waived his <u>Miranda</u> rights prior to making his statements to the police.

It is well settled that police may not interrogate a suspect who has been taken into custody without first advising him of his <u>Miranda</u> rights.  <u>United State v. Newton</u>, 369 F.3d 659, 668 (2d Cir. 2004).  It is only in the context of a custodial interrogation that a defendant is entitled to be informed of his <u>Miranda</u> rights. <u>Dickerson v. United States</u>, 530 U.S. 428, 434-35 (2000); <u>Tankleff v. Senkowski</u>, 135 F.3d 235, 242-43 (2d Cir. 1998).  Thus, "if the police take a suspect into custody and then ask him questions without informing him of [his <u>Miranda</u>] rights [], his responses cannot be introduced into evidence to establish his guilt."

10

Berkemer v. McCarty, 468 U.S. 420, 429 (1984).

To establish a valid waiver of Miranda rights, "the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995)(per curiam)(citing Moran v. Burbine, 475 U.S. 412, 421 (1986)).   The law "does not impose a formalistic waiver procedure that a suspect must follow to relinquish [his Miranda] rights. . . [T]he law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." Berghuis v. Thompkins, 560 U.S. 370, 385 (2010).  Thus, law enforcement need not "obtain an express waiver of [Miranda rights] before proceeding with interrogation."   Id. at 387 (internal quotation and citation omitted); see also United States v. Plugh, 648 F.3d 118, 127 (2d Cir. 2011)("While the government bears the burden of demonstrating a knowing and voluntary waiver, such a waiver need not be express."). Rather, an implicit waiver may be inferred from the defendant's conduct. Berghuis, 560 U.S. at 397-99; see also North Carolina v. Butler, 441 U.S. 369, 373 (1979)("[W]aiver can be clearly inferred from the actions and words of the person interrogated.").   Accordingly, "[w]here the prosecution shows that a Miranda warning was given and that it was

11

understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." Berghuis, 560 U.S. at 384.

Here, there is no dispute that the defendant was "in custody" for purposes of Miranda at the time he made the statements at issue. There is also no dispute that law enforcement interviewed Singletary while he was in custody – in other words, law enforcement engaged in a custodial interrogation with defendant. The issue before the Court is whether this custodial interrogation took place without reading Singletary his Miranda warnings in violation of his Fifth Amendment rights, and if he *was* read his Miranda rights, whether Singletary voluntarily waived his rights before making his statements to the police.

As stated earlier, the hearing testimony of Klein and Singletary conflicted on whether the defendant was read his Miranda rights prior to being questioned. I found the testimony of Investigator Klein to be more worthy of belief on this issue than the testimony of the defendant. Investigator Klein testified that he read the Miranda rights "verbatim" off of the RPD Notification and Waiver card. 8/26/14 Tr. at p. 14. Klein testified that for each line "No. 1 through 5" of the Miranda warnings he asked Singletary "if he understood," and Singletary "specifically said 'yes'" after being read each specific warning. Tr. at p. 14. After reading Singletary all five Miranda warnings, Klein then

12

asked the defendant two waiver questions, and Klein noted on the Waiver card that Singletary understood his rights and agreed to speak with the police. Id. at pp. 14-15. Klein also recorded all of Singletary's responses to the pedigree questions "verbatim" on the Waiver card.

Singletary's testimony on the crucial Miranda issue did not "ring true" to this Court. The defendant agreed with Klein that he was asked and answered the pre-Miranda "pedigree" questions prior to Klein questioning him about the shooting. Id. at pp. 9-10, 13, 42. It made little sense for Klein to take the time to ask the foundational questions necessary to establish that a Miranda waiver was knowing and voluntary and then ignore advising Singletary of the rights themselves. Based on the hearing testimony and my opportunity to view the manner in which each witness described the relevant events, I find more credible Investigator Klein's testimony that he used the RPD Notification and Waiver card to read the defendant his Miranda rights and the two waiver questions prior to interviewing him. See United States v. Parker, No. 02-CR-6091T, 2005 WL 1868795, at *4 (W.D.N.Y. Aug. 2, 2005)(noting that "magistrate judges [] have broad authority to hear witness testimony to resolve credibility issues," and holding that the magistrate judge [Payson, J.] did not err in finding that "the defendant's testimony was not credible, and instead relying on the credible testimony of" the police officer).

13

Moreover, although Investigator Klein testified that the defendant had smoked marijuana that morning, that in and of itself is not dispositive of understanding the warnings.  Investigator Klein testified that he had received training "regarding the effects of alcohol and also narcotics use," and during the course of his training and experience as an RPD Officer and Investigator he has come into contact with individuals under the influence of marijuana "[h]undreds of times."  8/26/14 Tr. at pp. 12-13. Investigator Klein testified credibly that defendant did not appear to be under the influence of drugs or alcohol during the interview and appeared to understand the questions asked and indeed corrected the typed statement that Klein had prepared during the break in the interview.  Based on the hearing testimony, I find that Singletary's use of marijuana did not impact the defendant's understanding or waiver of Miranda rights.  See, e.g., United States v. Maldonado, No. 11-CR-6166, 2012 WL 826998, at **3-5 (W.D.N.Y. Feb. 17, 2012)(recommending that the defendant's motion to suppress be denied where the defendant claimed he made his statement to law enforcement while "in withdrawal and/or under the influence of soboxone," because the officer testified credibly that "he was familiar with the symptoms of drug and alcohol intoxication, as well as the symptoms of withdrawal," and the defendant "displayed none of those symptoms"), adopted by 2012 WL 827033 (W.D.N.Y. Mar. 9, 2012); United States v. Holley, No.

14

10-CR-6116L, 2011 WL 4565041, at **7-8 (W.D.N.Y. Aug. 30, 2011)(recommending that the defendant's motion to suppress be denied where the defendant claimed "he was so intoxicated on ecstacy and marijuana at the time he made [his] statements that he does 'not recall being advised of or waiving my Miranda [r]ights,'" because the officers testified that the defendant "did not appear to be influenced by drugs or alcohol during the interview and ... appeared to understand the questions put to him")(citation omitted).

Based on the foregoing, I find that Singletary's statement is admissible and should not be suppressed. Accordingly, it is my Report and Recommendation that defendant Singletary's motion to suppress his March 3, 2014 statements to law enforcement on grounds that his Fifth Amendment rights were violated should be denied.

## Conclusion

For the foregoing reasons, it is my Report and Recommendation that defendant's motion to suppress statements (Docket # 14) be **denied**.

**SO ORDERED.**

JONATHAN W. FELDMAN
United States Magistrate Judge

Dated: December 22, 2014
       Rochester, New York

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York.[1]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections ... shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b)(2) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**SO ORDERED.**

_____
Jonathan W. Feldman
United States Magistrate Judge

Dated:    December 22, 2014
          Rochester, New York

---

[1]    Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. <u>United States v. Andress</u>, 943 F.2d 622 (6th Cir. 1991); <u>United States v. Long</u>, 900 F.2d 1270 (8th Cir. 1990).